W. DUNNING, Guardian, Appellant, v. S. E. BENSON et al., Appellees.

**DEEDS: Validity—Fraud—Evidence.** Evidence held quite insufficient
1   to establish fraud in the execution of a deed to real estate.

**FRAUDS, STATUTE OF: Real Property—Executed Oral Agreement**
2   **to Convey—Effect.** The execution of a deed to land in accordance with a prior oral contract so to do necessarily renders quite immaterial all questions under the statute of frauds.

**APPEAL AND ERROR: Scope of Review—Inadvertent Error Caused**
3   **by Appellant.** An inadvertent error in computing the amount of an indebtedness, even though the computation is in accord with the testimony of appellant in the trial court, will be corrected on appeal, the error being made manifest from other portions of the record, and the matter not having been a matter of controversy in the trial court.

**COSTS: Taxation—Improper Taxation.** In an action in which plaintiff
4   was defeated on the main issue, it is improper to tax the costs to defendant because defendant, during the trial, concedes the correct-

ness of an item which was not demanded in the petition and which was never in controversy.

**Headnote 1:** 18 C. J. p. 448. **Headnote 2:** 27 C. J. p. 336 (Anno.) **Headnote 3:** 4 C. J. p. 717 (Anno.) **Headnote 4:** 15 C. J. p. 35.

*Appeal from Hancock District Court.*—C. H. KELLEY, Judge.

JUNE 25, 1925.

SUIT in equity to set aside a deed executed by Martin Schreck to the defendant Peter Schreck. The suit is predicated upon alleged fraud and conspiracy practiced by and on behalf of the defendant upon the grantor, Martin Schreck, an alleged incompetent. The answer admitted the execution of the deed, and denied all allegations of fraud and conspiracy. It pleaded subsequent affirmance and ratification of the deed, and pleaded further explanatory facts surrounding the transaction, and averred that such transaction was in all respects fair, and that the said grantor received full consideration therein. On the issues thus made, the court found for the defendants, and dismissed the petition. The plaintiff appeals.—*Affirmed.*

*Peisen & Soper* and *Senneff, Bliss, Witwer & Senneff,* for appellant.

*Stipp, Perry, Bannister & Starzinger* and *Thompson, Loth & Lowe,* for appellees.

EVANS, J.—I. The record discloses some controversy between the parties as to the validity of the appointment of the guardian, who acts as plaintiff in this case. It is contended also by the defendants that Martin Schreck was

1. DEEDS: validity: fraud: evidence.

not an incompetent, within the meaning of the statute, and that he was not subject to guardianship. It appears that Martin never went to school, and never learned to read or write. There is evidence that he was subnormal mentally. The only allegation of fact upon which the petition for guardianship was predicated, and likewise the appointment, was that he was "susceptible to influence." The record discloses irregularities in the matter of the appointment.

We shall have no occasion to deal with any of these questions. Martin disclosed himself on the trial as a good and capable witness. At the time of the appointment, he was 52 or 53 years old. He had been an industrious and frugal man all his life, and had transacted all his own business. It appears to have been done at all times intelligently. Substantial reasons for the appointment of a guardian for the purpose of this suit are not prominent in the record. In view of the fact that the result in this case turns, as will later appear, upon the essential fairness of the transaction under attack, the degree of competency possessed by Martin will not be discussed.

The petition charges in substance that, in April, 1915, the signature of Martin was procured to a deed which purported to convey his farm of 160 acres to the defendant Peter Schreck, for a purported consideration of $24,000, no part of which was in fact paid; that Martin did not know that he had signed any such deed at all, though he knew that he had signed various papers at the request of Benson, to whom he had lent the use of his name in various transactions; that afterwards, by a continuance of the same fraud and conspiracy, the defendants induced Martin to accept a $10,000 mortgage on the farm, duly executed by Peter, in discharge of Peter's obligation to him; and that no other consideration was ever received by Martin. It is further averred that Peter Schreck had sold the land for $24,000, and that it had since appreciated in value, and was worth $40,000. It is also averred that, in the sale of such land, Peter took conveyance of other lands in partial payment therefor, and that the subsequent appreciation in value of said other lands is $5,000. The prayer of the petition is for the peak sum of $45,000.

The substance of the defense is that Martin never owned but a half interest in the farm in question, though he held the record title to all of it, and that such fact was always understood and recognized by Martin himself; that the defendant Peter Schreck took the conveyance subject to incumbrances amounting to $4,300; that the net value of Martin's interest in the property was a little less than $10,000; and that $10,000 was paid to him therefor by Peter, in the form of a mortgage covering the entire property. This defense was sustained by the decree of the trial

court. It will be noted, therefore, that the pivotal fact in the case is whether Martin was or was not the absolute and unqualified owner of the entire farm, or was the owner of only a half interest therein. The fighting points in the case are purely questions of fact. The record is voluminous, comprising nearly 500 printed pages. It will not be possible for us to discuss the details of the case within the proper limits of an opinion. The record includes a considerable discussion of the detailed facts in the case by the judge of the district court rendering the decree. Such discussion analyzes the evidence very fairly. We find ourselves in full accord with such discussion, and with the conclusion reached. The few salient reasons for such conclusion will be stated herein as briefly as practicable.

This is a family lawsuit; hence the voluminous record. Martin and Peter Schreck are brothers. Mary Benson is their sister. S. E. Benson, known in the record as "Sam," is the husband of Mary. He is a man of varied occupation, including that of real-estate agent. His character has been somewhat perforated in this record by stray bullets from various directions, which have served no other function in the case. He is charged by the plaintiff as being the chief manipulator of the conspiracy complained of.

The Schreck family came from Ohio to Iowa in 1878 or 1879, and located in Franklin County, near the county line between Franklin and Wright Counties. The family consisted of father and mother and six children. The children in order of ages were Fritz, Minnie, Kate, Charles, Martin, and Mary. Mary, the youngest, was then 9 or 10 years of age; Martin was 2 years older; and Charles, 2 years older than Martin. The father bought a half section of land, and the family moved upon it. Title was taken in the name of the oldest son, Fritz. Upon this farm, in 1880, Peter, defendant herein, was born. Shortly after the birth of Peter, the father died. The mother and her children continued the struggle for 4 or 5 years longer, but did not prosper. They lost the farm, and with it all else that they had. In the meantime, the two older daughters had sickened and died. At about this time, also, Fritz, Charles, and Mary married, and the dissolution of the family as a unit had become quite complete. Thereupon the mother, who, like Naomi of old,

had found only sorrow and sepulcher in this land of Moab, turned back to the home of her girlhood in Ohio, taking with her her two younger sons, Martin and Peter. She found such employment as she could, and took in washing for a living. Martin, then a boy in his teens, engaged employment, and earned such wages as he could. After about one year or more of the sojourn in Ohio, they received a communication from Charles, to the effect that he had contracted to buy a quarter section of land in Wright County, in the near vicinity of the former home, at a price of $7.50 per acre. $50 of the purchase price was to be paid down, and the balance in annual payments of $100. Charles advised that the undertaking was larger than he was willing to carry alone, and he proposed to them that they return to Iowa, and that they take a half interest in such contract. In response to this proposal, they came back to Iowa, the mother and Peter coming first. Martin was attracted by promised employment in Wisconsin, which he took, to his later disappointment, and which delayed somewhat his return to Iowa. The result was that, with such assistance as Charles could give them, they built a very humble little house upon the north 80 of this quarter section, and thereafter occupied it as their home; the household consisting of the mother and Martin and Peter. The quarter section then contracted for by Charles, and by him shared with his mother and Martin, is the identical quarter section herein involved. They received no title papers at that time, so far as is disclosed by the record. Their equitable title consisted in their agreement with Charles, who held an executory contract of sale. This equitable title under which they took possession was their only title until September, 1897, at which time the vendor of Charles executed a deed to Martin. The mother and her two sons, both minors at the time, occupied and worked the land together, and devoted all their energies and their earnings from the farm to a common fund, if "fund" it could be called. No other source of revenue was available to any of them. They so occupied and worked this farm for several years as a family. The mother was the head of this family. She was legally entitled to the services and wages of her minor sons.

This was the origin of Martin's title to the quarter section now involved in this litigation.

Sometime in the nineties, the mother was called back to Ohio to care for her parents, and was detained there for a period of two or three years. In the meantime the farm was rented, and Martin and Peter engaged employment. Martin looked after the farm and collected the rent, and paid whatever was paid upon the contract. When the mother returned from Ohio, about the year 1897, she brought with her about $1,000, which she had just received from the estate of her parents. It was about this time that the farm was finally paid for, and legal title thereof taken in the name of Martin.

In 1898 or 1899, the mother greatly desired to acquire a home in the near neighborhood of Charles, who had acquired a home 35 miles distant, near Iowa Falls. A 60-acre farm in his near vicinity was for sale at $35 per acre, and it was purchased and title taken in the name of Martin. This was improved, with the view of making a home upon it for the mother and her two unmarried sons. In 1900, Peter was married to the daughter of S. E. Benson by a former marriage. That is to say, Benson, his brother-in-law, became also his father-in-law. In 1901 or 1902, Benson and Martin and Peter went together to North Dakota, and filed homestead claims there,—an enterprise that resulted in no advantage to any of them. The mother went with them, and died there in August, 1902. In 1904, Charles conveyed the south 80 of the quarter section to Martin, in exchange for the 60-acre farm which had been acquired during the mother's life in his neighborhood. Each tract was figured at $150 an acre, and Martin executed mortgages on the quarter section, amounting to $3,000, to pay the difference in the exchange price. Neither Martin nor Peter resumed occupancy of the farm at this time. It was rented by Martin for several years, Peter in the meantime having entered upon an enterprise in Missouri. In 1909, Martin and Peter reoccupied the farm, Martin making his home with Peter and his wife thereon. Their contract was informal and verbal, and was, in substance, that they would work the farm together, and share equally in everything. The household expenses were paid out of the earnings of the farm, and Martin paid no board in any other sense. This arrangement continued up to the year 1917, when Peter claims

to have purchased Martin's interest, for which he executed the
$10,000 mortgage heretofore referred to.

Into the foregoing outline the defendants introduced many
details of evidence tending to show a fairly distinct arrange-
ment, well understood in the family, between the mother and
Martin, that he owned a half interest in the land, and that
Peter was to have the other half interest, and Martin was to
protect him in it by proper conveyance. This is the crucial
point in the case. A reading of the evidence convinces us that
this contention is fairly sustained. The trial court so found.
The circumstances surrounding the parties all point in the same
direction. We are satisfied from the record that Martin always
so understood it, and always intended in good faith to recognize
his mother's equitable right and his own obligation to hold title
in trust for Peter to a half interest in both farms. It appears
that the deed under attack bears the date of April 2, 1915. It
was actually executed at that time. If the defense rested upon
that deed alone, it could not prevail. That deed was colorable
only. It represented no actual transaction. Peter had nothing
to do with it, and did not know of its existence. The sister,
Mary, was largely responsible for the execution of that deed.
She knew the understanding between the mother and Martin.
She conceived the idea that her brother Charles was about to
institute some proceeding to establish the mother's title and to
partition the farm among the mother's heirs. She testified that
Charles had proposed such a course to her. She communicated
the fact to Martin. Mary and Martin, in their ignorance, and
perhaps with the advice of Mary's husband, conceived the idea
that Charles' plan could be foiled by a conveyance of the whole
farm from Martin to Peter. Benson went with Martin to a
notary public, who prepared the deed, and Martin signed and
acknowledged the same. The deed was then put into the hands
of the sister, Mary, who held the same unrecorded, and deemed
herself to be thereby protecting both Martin and Peter. Martin
received nothing for this deed at that time. Later, however, and
in the year 1917, it was agreed between Martin and Peter that
Peter would buy out Martin at a valuation of $150 an acre.
The farm was incumbered by a mortgage for $2,200 and a
drainage tax for approximately $2,100. After the deduction

of these incumbrances, it left a net purchase price of one half of approximately $20,000 to be paid to Martin for his half interest. If that was a fair price to be paid at that time, then the contract between Martin and Peter is unimpeachable. At the time of this transaction, Mary produced the deed of 1915, and, in lieu of having Martin execute a new conveyance, this old deed was then and there delivered to Peter. Under the circumstances shown, it was a good and valid delivery of a good and valid instrument, though the instrument was voidable before. Martin took the full benefit of it, and continued to ratify the transaction for a period of two years before he brought this suit. From the time of this transaction, he ceased to make his home with Peter, and took up his home with Charles. If Martin needed an advisor, Charles assumed to advise him. Charles knew of the transaction for two years before the beginning of this suit.

We do not overlook that there was some controversy later over the possession of the $10,000 mortgage. Martin had left all his papers in the custody of Mary. Sometime later, when Martin wanted his mortgage to use in some proposed Missouri investment, Mary refused to let him have it, because she was afraid of Missouri investments and afraid that he would lose his money. Mary's attitude was unjustifiable; but she yielded, and gave Martin his mortgage. The record would not justify a finding that Peter had any responsibility for that controversy.

The foregoing is sufficient to give a general idea of the ground of decision. We hold, upon this record, as did the trial court, that, though Martin held the legal title to all this property, he never owned equitably more than a half interest therein; that it was in recognition of this fact by him that he accepted the $10,000 as the value of his half interest, subject to the incumbrances.

The question whether the verbal agreement and understanding between Martin and his mother was such as could have been proved against him, is not a material consideration in this 2. FRAUDS, STATUTE OF: real property: executed oral agreement to convey: effect. case. We are only concerned now with the question of the fairness and honesty of the transaction into which he voluntarily entered in 1917. If the transaction under attack is fairly ex

plained by this preceding understanding and agreement, then the performance of such agreement by Martin and the acceptance of performance by Peter were in all respects fair and honorable, and furnished a complete answer to the charge of fraud. If Martin later repented his honor, he could not thereby change the character of the transaction already had, nor revive his right, if any, to rely upon the statute of frauds. The transaction itself became such evidence as satisfied that statute. Only the *weight* of such evidence may now be challenged.

II. There is a cross-appeal by Peter. It appeared on the trial, from the testimony of Peter, that, after the transaction in 1917, they had a public sale of the personal property. The proceeds of this sale would be owned equally by Martin and Peter. The $2,200 mortgage was about to fall due, and Peter had no money with which to pay the same, except the proceeds of sale of the personal property. It was agreed between him and Martin that he might pay this mortgage out of the personal property, and that he should reimburse Martin therefor later. The proceeds of the personal property, all told, were $3,487.92. Martin was, therefore, entitled to receive $1,743.96. It appears further that Peter gave Martin a note for $610.96. These facts appeared quite casually from Peter's testimony on the trial. No claim was made in the petition for either of these items. In announcing his conclusion upon the main case, the trial judge called attention to this feature of the record, and suggested, in effect, that, if there was no objection, he would enter judgment for Martin against Peter for these amounts. This appears to have been taken for granted and assented to at the time, and judgment was entered accordingly.

3. APPEAL AND ERROR: scope of review: inadvertent error caused by appellant.

The ground of reversal on the cross-appeal by Peter is that the inclusion of the item of $610.96 was an inadvertent duplication, and that such item was in fact included in the $1,743.96. This contention has support in the figures made by the clerk of the sale. He appears to have deducted $2,266, being the amount of the $2,200 mortgage, from the proceeds of the sale. This left a balance of $1,221.92, one half of which would be $610.96; and such is the amount for which Peter gave his note. Manifestly, Peter should have given his note for $1,743.96. The

figures made by the clerk of the sale would indicate his understanding that the funds of both Martin and Peter were to be devoted to the payment of the $2,200 mortgage. It is quite possible that he did not know that, under the arrangement between Martin and Peter, the mortgage had become the debt of Peter. Peter owed Martin not only the $610.96, but also the $1,133 which had been taken from Martin's share of the proceeds and applied upon the payment of the mortgage. Peter, being permitted to retain all the proceeds of the sale, was indebted for one half thereof to Martin, $1,743.96. The amount of such indebtedness was not changed by the fact that a note was mistakenly given for part of it only.

. While we have no doubt of the correctness of the figures herein indicated, and that the item of $610.96 covered by the note is a duplication of what was already included in the larger sum of $1,743.96, yet we are confronted with some difficulty to award the cross-appellant relief because thereof. The judgment entered by the court was in accord with the literal terms of Peter's own testimony. Ordinarily, such a situation would be deemed quite conclusive against him. It appears, however, that all the figures pertaining to this sale were proved by Exhibit 67. This was the report and computation made by the clerk of the sale. Peter produced this exhibit, and his oral testimony was merely incidental thereto and somewhat in the nature of an interpretation thereof. At that stage of the trial, this particular fact was not material to the issues made by the pleadings. · For this evident reason, the figures did not, at the time, command the scrutiny of the attorneys on either side. Exhibit 67 makes it very clear that the total obligation of Peter to Martin, from the proceeds of the sale, was $1,743.96. Counsel for the appellant makes no contrary contention in argument. We are of the opinion that Peter's inadvertent error in the interpretation of the figures should not be deemed to conclude him against the correction here of a manifest error. We reach this conclusion the more readily because this particular indebtedness was not in issue in the pleadings, and had never been in dispute between the parties.

The judgment will, therefore, be modified in this respect.

Interest will be computed from October 31, 1917, at 8 per cent on $610.96, and at 6 per cent on $1,133.

III.　It further appears that the court entered judgment against Peter for all the costs.　Such order could be predicated only upon the ground that a judgment for some amount had been entered against him.　This fact might have furnished a reason for an apportionment of the costs.　But it appears affirmatively that no costs of the trial were incurred in the proving of this item.　It was proved solely by the concessions of Peter as a witness.　No claim had been made for it in the petition.　No demand had been made for it otherwise.　There was never any dispute or controversy between the parties over it.　Upon such a state of facts, we think that it was error to tax any part of the costs to Peter.

4. Costs: taxation: improper taxation.

The judgment below will, therefore, be modified in that regard also.

On appeal of the plaintiff, the decree below is—*Affirmed*.

On the cross-appeal of the defendant Peter Schreck, it is— *Modified and affirmed*.

Arthur, Vermilion, and Albert, JJ., concur.

Faville, C. J., having been of counsel in the court below, takes no part.